Case number 23-5110. People for the Ethical Treatment of Animals et al. Ethelence v. Lawrence Tabak in his official capacity as acting director of the National Institutes of Health and Xavier Becerra in his official capacity as Secretary of the U.S. Department of Health and Human Services. Ms. Krantz for the Ethelence, Ms. Utrecht for the Ethelese. Good morning Ms. Krantz. Good morning your honors and may it please the court. My name is Stephanie Krantz and I represent the plaintiff Ethelence. This case is about a government agency's decision to ban criticism of its policies in otherwise open comment threads on the agency's social media pages. The NIH uses keyword blocking on Facebook and Instagram which functions as a prior restraint on all comments that contain the words and phrases of the agency's choosing. Here without informing the public the NIH has chosen to censor phrases like stop animal testing, torture, and hurt. This is brazen discrimination against criticism of the agency's own role funding animal testing and it distorts public debate about the NIH's priorities and its practices. The district no longer bans stop animal testing or hashtag stop animal testing correct? That's right your honor. After this case was filed the NIH removed a few words from its list of blocked keywords including stop animal testing and PETA which it had also previously censored. But that decision... This is just for injunctive relief? Okay so we're just supposed to look at the policy in its current form? No your honor I think you also need to look at the policy as it was implemented when the case was filed. That's because although those keywords were removed it hasn't been accompanied by any statement from the NIH that it will not block those terms in the future. And there is nothing in the district court's opinion that would prevent it from blocking those terms again tomorrow. So I think they're still relevant to showing why the NIH's conduct here was viewpoint discriminatory in and of themselves. They're also relevant because I think they color the rest of the list of the blocked keywords that that issue in this case. Words that are still unblocked like torture, torment, hurt, stop, kill. These words are all indicative of criticism of animal testing rather than animal testing as a subject matter. And I think that's made even clearer when you take a step back and look at the NIH's overall course of conduct. Now it's the government's burden to prove that its conduct... This is something that I find difficult. All these points you're making would be relevant if you thought intent is what mattered for viewpoint discrimination. But it's quite emphatically not your position that looking at these keywords objectively to decide whether they are on their face viewpoint discriminatory. Is that right as a methodological matter? I think that is right, your honor. And I think when you look at the list of keywords themselves, looking just on their face, you can see that the keywords themselves are evocative of a particular viewpoint, right? Cruel, revolting, stop testing. So can you... This is sort of related to Judge Millett's question, but how are we supposed to do this? Is it word by word? Do we just look at them as a whole and say this policy as a whole on its face discriminates? Because this can get... could get tricky given, for example, that they've removed some of the terms. And I just... can you lay out how you would tell us to write that in an opinion? Yes, your honor. I think you should look at the list of block keywords as a whole, and that's the list that we've highlighted at JA 76, which is the joint stipulation. The reason for that is the government has always defended this list as a whole. It hasn't highlighted any of these keywords as not being targeted towards the criticism at issue in this case. And I think the fact that the NIH is targeting criticism as a kind of objective indicia of its intent here, intent as in a desire to block off a certain viewpoint and treat it disfavorably, not intent as in denying motive here, is made even clearer by the overall record. The NIH has argued in this case that it's enforcing an off-topic policy. Now it's the NIH's burden to prove that that's true, that its conduct is not in fact viewpoint discriminatory. And the overall course of conduct here I think just undercuts that argument entirely because it is so over-inclusive and under-inclusive when compared to the NIH's goal. It's over-inclusive because this undoubtedly suppresses speech that is on topic, even under the NIH's narrow view of topicality. And you know I think the NIH will tell you that this is a small amount of speech on its social media pages, but it's not. There are 37 different Facebook and Instagram posts in the record. Over a third of those posts directly reference animal testing in the text of the post itself. It feels to me like there's a bit of talking past each other in this case because their argument is we're not blocking these things because of a particular viewpoint. We're blocking them because they are inundating. These are the words that are inundating our comment threads so that other comments get lost, so that people get deterred from coming to our pages and commenting themselves. These comments are suffocating our Facebook and Instagram comment threads. And so that's why we have picked those words. One, is it accurate? Is that flooding accurate? So whether or not the subject post is about or implicates animals or animal testing, these comments are flooding their comment threads. They're worth before the keyword stops. Flooding is sort of hijacking the comment thread. No, Your Honor. I don't think that is accurate. The government points to a handful of exhibits and it's certainly true that in those exhibits there is a high volume of speech criticizing animal testing. But there are many other exhibits in the record that don't feature any criticism of animals. I'm not clear to me whether those ones were post-keyword blocking or not. But it seems to me like, I know you all did a stipulated record, but this, if their theory is this inundation or hijacking of our comment thread, and yours is viewpoint discrimination, there's a critical fact, critical facts that need to be resolved here about this volume. If there, take it away from your client, but if there were some entity, the Flat Earth Society, and every time anything was posted on NIH or the U.S. Geological Service or NASA, they would blast it and drown it with flat-earth advocacy. In that situation, if an agency were to block flat earth as a keyword and not black, but round earth comments, would that be viewpoint discrimination in that scenario? I know it's actually, you don't say this, Your Honor, but we just don't have a fact finding one way or the other, but if we had such a fact finding, would it be viewpoint discrimination still? Yes, I think even then it would be viewpoint discrimination, and that's why I don't think that... Agencies have no capacity on their Facebook pages, on their Instagram pages, to control in any way the subject matter of comment threads. They do. They absolutely have that authority, Your Honor, and the NIH could have taken a number of different courses here, right? It could have used manual moderation to ensure that it was actually... Let's just assume for government agencies or for others that have hundreds and hundreds of thousands people following their websites, government doesn't have the resources. They would rather, during a pandemic, spend their resources on dealing with public health issues than manually moderate comment threads. I mean, I think that is an And by the way, if they were doing that, y'all would be bringing challenges about the lack of guidance and the, you know, uncontrolled discretion of the manual monitors. So I'm not sure that's an answer. When you have the situation where certain speakers, the common thread, at this point maybe they even got bots doing it for them, are suffocating the government's webpages' comment threads, that's not an objective non-viewpoint base. We're picking the words based on the volume of appearance, extraordinary volume of appearance, and the consequences of that, not their meaning. Well, Your Honor, I want to make three points in response to that. The first is, as you say, I do think there are factual questions if what you're focused on is... You have a summary judgment on this record, too. You both do. That's what's difficult about this. That's right, Your Honor, and I think there are factual questions if you think the government's subjective intent matters, if you think that it is allowed to discriminate on the basis of viewpoint if it has a viewpoint-neutral rationale for doing so. Well, we don't think that's true, but I do think that more fact-finding would be required. You just said, even if they don't care about viewpoint, they are only targeting volume words and volumes at an extraordinary level. It sort of hijacks their page. That's right. That's still viewpoint discrimination. That's right, because it's not about the motive. In this case, for that motive, I'm talking about objectively, they can demonstrate in the record the volume, the consequences, and that the only words they've picked are the ones that are throttling their social media communications. But I think the problem here... In that case, that's still viewpoint discrimination. We're assuming now there's no subjective intent and the objective explanation is related to something unconnected with viewpoint. I think you need to look at cases like Lamb's Chapel, right, where the court said, even if you have a justifiable reason for wanting to keep religion out of school facilities, when you target religion, even if you target all religions and you prevent religious speech on otherwise unsuitable... Conscious intent to keep a particular viewpoint out on subjects that were already being discussed because of the viewpoint. It was not a case where, it's hard to imagine how this would happen in a physical facility, but, you know, if they opened the doors, there were going to be 8 million people trying to squeeze into the high school gymnasium. And so we said, it turns out every time it's a religious group that wants to speak here, they bring 8 million people and we have fire hazards and we get the whole place shut down. And they said, so we just can't let these groups that have 8 million people, and the list of those groups happens to all be religious groups, that would still be viewpoint discrimination on Lamb's Chapel? When they have an objective reason for doing this, not related to Well, I think in that case, it would depend on the government's justification. If it could build out a record, then that might be a sort of content neutral reason for limiting... I don't know if they could or not, we don't have these facts, but if government could, in some case, my flat-earth hypothetical, build out a record that says the amount of flat-earth commentary, no matter what we say, what we do, what we post, is suffocating, drowning our comment threads. And it's just volume. We're just banning the volume words. If it was round-earth, we would ban that too. That would be okay. I get that you don't think that's the record in this case, but... I don't think that would be okay, Your Honor, using keyword blocking. And I think there's a difference here between whether or not the government has a legitimate motive, has a legitimate reason to moderate or regulate that speech in some way, versus the tool that is used in this case, right? Because in this case, the government itself references animal testing, and it does so with regularity, but it prohibits commenters from raising concerns and criticism of animal testing, even on those very posts, right? It's not a question of a post-by-post analysis of what might be on-topic or off-topic. The NIH has created... Quite hypothetical about the gymnasium. There's going to be people there, I mean, amongst those, and maybe all eight million people, are going to be very interested in talking about the same topics that other groups are talking about, because other groups simply are not causing the system to break down in the way that the eight million-member group would. That's right, and I think that analogy... If they had a record that showed that these keywords reflect the internet equivalent of the eight million-member group, so that everything just stops working in the comments thread, then it would be okay, but that's simply a record that hasn't been developed yet. Well, I think it's both the fact that there isn't evidence of that in the record, and the fact that this is so different from the kind of physical analogy that you've raised, Your Honor. That's because, you know, in the physical world, I think the analogy would have to be that you have an event in which a lot of people are bringing up concerns, right, about Flat Earth, and in a physical world, you might kick those people out, prevent them from speaking further. What's happening here looks very different. What's happening here would be equivalent to, I think, NASA saying at this event, you know, these Flat Earthers are raising comments that we think are irrelevant, and we think they're preventing other people from speaking. So we're going to go and purge every mention of Flat Earth from every public event we've ever had, and in the future, when we talk about the Flat Earth controversy ourselves, we will prohibit people from bringing up those concerns. That's the effect that keyword blocking has here, and that dramatic over-inclusion demonstrates that there is such a poor fit between what the government says it's doing, which is invoking an off-topic rule, and what it's actually doing, which is blocking this criticism, regardless of whether it is on or off-topic, that an inference of viewpoint... Sorry, just want to make sure I understand your position. So with the gymnasium hypothetical, I thought your position would be that if the policy came out, no more religious groups, but that's because it's facially viewpoint based, that is unconstitutional, right? And instead, what the school would have to do is come up with a facially neutral policy that said something like, groups that bring eight million people are not allowed, and then you'd have an inquiry about intent, correct? Well, I think then you'd have an inquiry about the justification for that rule, you know, no groups of X many members allowed, and you want to make sure... But the threshold issue is, is the policy facially neutral, right? Yes. And then in Flat Earth, if the big problem is everyone's saying the earth is flat over and over and over again, is it your position that if the agency wants to do something about that, what they need to do is ban discussion of the subject of, I guess, the shape of the earth, but what they cannot do is say we're going to ban this one viewpoint on that otherwise includable subject? Yes, I think it's very clear that the agency cannot ban one viewpoint on an otherwise includable subject. Just to follow up on that, if you'll permit, if they have a list of ten people, they've done it many times, they happen to all be religion groups in your Lamb's Chapel world, are they allowed to ban those ten groups? I think it would be very difficult to constitutionally ban those groups forevermore, and that's the way keyword blocking functions in this case. I think the case really could... Can I just return to this? Yes, Your Honor. Because I want to know if I understand what this point is correctly. If that policy said we are banning going forward any group that has been here five or more times and caused XYZ problems, that would then be a facially viewpoint neutral policy, right? Yes, exactly, Your Honor, and so I think here this court's consideration could start and stop with the fact that the words block themselves of interview points, but digging in even further, I think the court's consideration, because of the way that it functions to prohibit perspectives on otherwise includable subjects, things like the development of the COVID-19 vaccine, things like the studies relying on testing, on animal testing that the agency itself brings up. Seems like just basically the use of keyword filters, if your view of the law is right, is extremely difficult, because it sounds like to have a facially neutral keyword policy, they just have to block commonly used words and block those as well, so that they could claim what we're actually doing is blocking off the whole subject matter, and then I think they would get up and say that's just impossible, because there's not, we don't have the record of what, you know, words are associated with those types of views, and so we can't, you know, use keywords that are balanced on this issue. What's your response to that? Well, I think the problem with keyword blocking as a means of enforcing an off-topic rule is that it's totally untethered to that goal. Keyword blocking may be a useful moderation tool as a means of enforcing other types of speech limitations, where context isn't required to determine whether speech is in or it's out, but because it can't do that function right now, as it's currently instantiated, keyword blocking applies to the whole page. It can't go post by post, and so there's no ability to use nuance  or not, so it is a very poor fit. I think it would be difficult to justify the use of keyword blocking as the sole means of enforcing an off-topic rule, and that's exactly what we have here, because there is no evidence in the record that even, you know, before the NIH felt that it had limited, especially limited constraints due to the COVID-19 pandemic, there's no evidence that it ever used manual moderation against any other type of off-topic speech, and we've pointed to off-topic speech about COVID-19, for example, appears on 12 of the exhibits in this case, even where that is not raised at all in the case. Just to understand your answer, Judge Garcia, can they use keywords to try to filter out solicitations? I think that might be a circumstance in which keyword blocking could be used in a way that is more tailored to the goal at hand, right? Something like a profanity filter, where the discussion doesn't really turn much on the actual context of the comment, but the inclusion of those particular words. What makes it such a poor fit here? Well, it includes, it's not a comment guidelines, include personal attacks of any kind. So, if they filter out, if there's five people who are the objects of the worst of vitriol in comment threads, but across time and across the page, can they ban comments about those five people? They might be able to do so. That is not what the government is arguing. I'm asking your position. So, because you've mentioned a couple of researchers, and they've banned those names. Those two, there's two. Sorry, I forget the names of them. Harlow and Suomi. Harlow and Suomi, yes. So, that's okay. If that, again, there's a lot of factual development here that's missing. If they did that under, not under off-topic, but under personal attacks of any kind, they can use keywords for that. That would be overkill. I think keyword blocking would be more tailored to the government's goal. I'm not sure whether it would be constitutional, though, because it would. I mean, that's what I'm asking you is whether, is the implication of your argument that keyword blocking just can't be done unless it's for, you know, the George Carlin's 10 Dirty Words or something like that? Yes, I think keyword blocking by itself as a tool is currently available to users can only be used in very limited ways. It might be with enough of a record that banning certain people who are exclusively the targets of abusive language, that might be constitutional. I think that would really matter with the factual development. Again, you also sought summary judgment on this record, so I'm not sure it's... That's right, Your Honor. ...needing more records. So, do you challenge or not the use of inclusion of Suomi and Harlow, at least on a Facebook? Yes, we do, Your Honor, because there is no evidence that the NIH blocked those terms because there were comments that violated its prohibition on personal attacks, and there's no evidence that would support... They just didn't say the right thing, is your view? If they said that, it would be fine, or do you still think it wouldn't be fine? No, they would need to say it and they would need to prove it, Your Honor, and there's no evidence that there have been personal attacks against these researchers that would allow the NIH to enact a prior restraint on anyone mentioning those names. But again, I think... That's great. You love that language when you're on the side of a First Amendment case, but this is a limited public forum here. We're talking about what the rules of dialogue are that they can set, and every rule of dialogue... I mean, everything in the NIH comment guidelines is a prior restraint. Well, Your Honor, I want to make... Everything is, right? Obscene language is a prior... Banning obscene language, or vulgar language, that's a prior restraint, right? Well, Your Honor, I want to make two points here, and the first... Banning speech that has racist connotations is a prior restraint. I just... I'm under... Right? Well, Your Honor, I think the question... That is a prior restraint. I think the question is how those rules are enforced. Okay, but it's not that they're prior restraints when we're dealing with a limited public forum, right? Well, again, Your Honor, I do want to make two points. The first is that we've argued that this is an open public forum, and that's because the agency has not sufficiently limited the forum to on-topic speech. All it does is ban these keywords that relate to criticism of animal testing. It doesn't enforce that guideline, or really any of its other guidelines, against any other type of off-topic speech. Are images or videos showing up? Yes, Your Honor. Yeah. If you look at Exhibit 1 in the record, you will see many images. You will also see external links. And one thing... I was a little confused. Maybe you can clarify for me on the appendix. Is all of the appendix before keywords were being used, or since they've been used? No, Your Honor. These exhibits, most of them come from before... I'm sorry, most of them involve the NIH blocking, the NIH page as it currently exists, so with keyword blocking in place. But I do want to get to, I think, the heart of your concern about the difference between all of the rules that the NIH has and the keyword blocking at issue in this case. We're not objecting to the NIH's comment guidelines, but it's important to note that they don't enforce those guidelines against speech generally. All they do is have keyword blocking, and what makes keyword blocking different from a rule that says no vulgar speech is that typically, in the normal course, you might have a comment that includes some vulgarity, and someone might see it and take it down and possibly write you a note. So the speech is out there. What makes keyword blocking so different is that it's automatically hidden. It's hidden with no notice to the commenter, and there's no notice to the people going to the comment thread, right? They believe this is an open thread for discussion on all topics. If you look at things like Exhibit 1, Exhibit 10, Exhibit 38, you'll see a kind of freewheeling discussion on lots of different topics. Is this notice to the speaker something they choose, or is that just default how keywords work on Facebook and Instagram, keyword blocks work? Well, that's the default, but the NIH could choose to notify the public and notify the speaker. This is my technology limitations. Is there some they can toggle off when they use keywords, or are you saying they would have to manually notify everybody? Someone would have to monitor every keyword catch and then manually notify somebody. Well, that is one option, but I think the bigger... If one thinks this isn't feasible... I don't think... Resource limitations. I don't think there's any technological fix at this moment. Maybe a Facebook, Instagram issue that people don't get notice of this. I don't think so, Your Honor, because the NIH doesn't even inform people going to its comment thread that it's using keyword blocking at all, and that would be essentially a cost-free way of providing notice to people of how the speech environment has changed. It would inform them of what is going on, but right now, we have what looks to be an open forum with the government in the background kind of plucking out this favorite speech. The comment guidelines are now linked to the Facebook and Instagram pages, and people have noticed that if that's what they do, it may get blocked. Well, the comment guidelines don't say that the NIH is using keyword blocking against this type of speech, and that's the sort of distortion that I think is so problematic here, that people are going to these threads without understanding that criticism of animal testing is being pulled out of discussion, even when animal testing is raised by the NIH itself. I mean, I think that's just a core flaw of the NIH's keyword blocking scheme that really can't be overcome, even if it points to additional examples where there is a high volume of speech about animal testing. Just one last question. In the brief, the government relied heavily on cases like Madsen, and I guess the simplified version of why is that they say the effect of that restriction was just to limit the speech of anti-abortion protesters, and so, too, here, it's okay to limit just this side of the debate because that's where the problem's been demonstrated. Could you just give us your, hopefully, brief distinction of that case? Yes, and I know my time has expired, so I will try to keep this with three just brief points. The first is that Madsen arose from an injunction that was targeted against a particular group of protesters who had already interfered with access to the clinic. It did not apply to all people who believed abortion was wrong. The second is the way in which the court in that case actually effectuated the goal of prohibiting the speech. It did so through content-neutral means. It mostly relied on the volume and the location of the speakers. It did not ban words like pro-life. It did not ban words like unborn, so it did not target in a viewpoint discriminatory way. And the third reason is that even with that content-neutral injunction, the Supreme Court narrowed it further to ensure that as much speech as possible could occur as long as it wasn't overriding the state's interest in allowing patients to receive medical treatments without undue anxiety and negative health effects. That sort of tailoring is totally absent in this case where the NIH freely admits that it blocks on-topic speech. It has absolutely no justification for suppressing. Thank you. Thank you, Your Honor. Good morning, Your Honor. I'm Jennifer Utrecht on behalf of NIH. At issue in this case is NIH's efforts to address the seemingly coordinated campaign to flood its social media pages with off-topic commentary related to animal testing. The plaintiffs object here that those efforts have successfully stymied their attempts to, for example, make off-topic comments on posts about public service recognition week. Can you define or tell me where the record defines off-topic? So off-topic is a term that I think is commonly understood. It's used in policy. It's not understood by me in this context at all. Does it mean off-topic for the NIH page as a whole or for each particular post? So I believe the stipulation refers to the policy being, I'm sorry, has to be on-topic to the posts. That's in your lawyer stipulation, but I haven't seen any evidence of any actual NIH definition or guidelines or anything that define what off-topic means. There's nothing in the comment guidelines that define what off-topic means. But as the district court here found, off-topic is a term that, although people might disagree on the margins about what is or is not on-topic, there is a pretty general understanding, at least for the majority of things, of what is or is not off-topic. Is the topic sort of limited to the narrow subject matter of the posting, or is it that this is the government posting? Government produces information a certain way. Is that part of the topic? I think that should be – the topic should be understood, of course, in light of the purpose of the forum. The NIH's social media pages are used to disseminate information about public health resources for people to address public health concerns and to talk about – They're the government. If someone's criticizing how they came to have that information, isn't that a legitimate topic in our country? It's not that it's not a legitimate topic, Your Honor. What's happening here is that the vast majority, the overwhelming majority of comments about animal testing are not on posts discussing research about animal testing. They're on posts about public service week, posts about caregiving resources for individuals with Alzheimer's. I mean, I don't – there's really no dispute. But there's been no – similar to in the brief, there's no consideration of what NIH's posts are actually about in the stipulated record. So, just one example. This is JA203. This is the zebrafish eye picture. It's, I suppose, quite literally a post about animal testing. And is it your position that it's common sense that criticism of animal testing is off topic? No, Your Honor. So, I think – That's the effect. I think we agree that keyword filters are an imperfect tool. And that if you are using them to screen for off-topic commentary in a situation like this where there is a huge swath of comments that are off-topic, it's going to occasionally capture comments that are on topic. We're not disputing that. That is an inevitable result of the use of keyword filters. But unless this court is going to say that keyword filters are per se unreasonable because they have to be tailored and never capture on-topic comments, then the record here does show that these keyword filters were chosen to address a significant problem, which was this coordinated effort to flood NIH's pages. It's more of a framing point to back up. Do you agree that if these keywords, we think they're facially viewpoint-based, then the government's intent and justification doesn't matter? So, I would dispute the first premise that they're not viewpoint-based. And I think that's always what – Absolutely understand that. But if, assume they are, we think on their face they are viewpoint-based, then you'd agree, right? That the intent, the justification, everything else is irrelevant. If the terms are on their face, viewpoint-based, and were not added for the purpose of viewpoint – I mean, I think that does matter, Your Honor. That's the intent. Because, of course, if what is happening is there is an empirical flood of, for example, one-word posts that say, stop animal testing. And that comment is – or that term is filtered because hashtag stop animal testing is posted hundreds of times on posts that are not about animal testing at all. Then what's being done there is we are filtering for off-topic commentary, not for that particular term. Not for the, you know, what that term reflects. And we're not – and the fact that it might have an effect on a particular type of speech because the people who are repeatedly violating the off-topic policy all have a particular viewpoint. That in and of itself isn't viewpoint discrimination if there is a viewpoint-neutral reason for what the government has done. Plaintiffs have cited other cases – of animal testing in the same way in Lance Chapel the subject matter was views on child rearing. You cannot have a policy that bans one view on the otherwise-includable subject. And it is hard to look at these terms and not conclude that there is a broad-based effort – or effort is the wrong word. The effect is to screen out anti-animal testing views. So, Your Honor, two points to that. The first is – so, using, you know, the term hashtag stop animal testing, for example, I'm not sure what the equivalent is on the opposite side to filter for. To my knowledge, there isn't a hashtag that's used for the opposite side of the debate. And a second point is if there was a hashtag that was used frequently by people who supported animal testing and that was flooding the comment section, NIH would also filter for that. And there's – the record here doesn't – because of that, the record here doesn't support the inference that plaintiffs have asked this court to draw, which is that because we have picked the terms we have, that that in and of itself reflects viewpoint discrimination. I think what they're asking us to conclude is that the natural effect of these keyword filters is to filter out one viewpoint on this allowable subject matter and not the other. And I am very sympathetic to the administrative convenience points, but I cannot find a case that says viewpoint discrimination is justified when the administrative burdens of, you know, blocking both viewpoints are too high. So, I think that it would be helpful to say, you know, the way that viewpoint discrimination is typically analyzed is we look to whether the government has asserted a viewpoint neutral reason for what it has done. We have. And then, you know, plaintiffs have asked, despite that viewpoint neutral reason, for this court to infer – nevertheless, to infer viewpoint discrimination because of the surrounding circumstances, because the terms that we have picked, despite being picked because they were a lion's share of the off-topic commentary, were picked to suppress their viewpoint. And the evidence, the totality of the evidence here, as the district court found, doesn't support that inference, in particular because plaintiffs haven't identified any type of comment that is similarly situated. I know there's been extended discussion here in this courtroom about what the record does and doesn't support in terms of how common off-topic commentary regarding animal testing was, but I would point this, Your Honors, to the district court's opinion on page 26, where it notes that the plaintiffs didn't meaningfully dispute the factual premise of our argument, which is that off-topic comments regarding animal testing were a huge majority, the lion's share of off-topic comments on NAH's pages. If that had been something that was disputed – Did you meaningfully document this? So there are a number of illustrative examples that are highlighted both in our brief and the district court's opinion. Exhibits 14, 16, 17, 18, they all illustrate dozens and dozens of sometimes one-word, sometimes two-word comments saying puppy killers or hashtag stop it. So 24, 36 posts on a comment thread is – For example, on the Alzheimer's post on Exhibit 17, I believe there were 500-and-something total comments, and more than 100 were related to – A fifth. That is the government's definition of sort of hijacking the comment thread. And so, Your Honor, that is an illustrative example of what NIH perceives – Your test is that dozens or a fifth are sufficient to overwhelm a comment thread. That's the line the government's adopting. But it's not one post, Your Honor. It's numerous posts. There are several examples on the record. And if plaintiffs had meaningfully disputed – They show up on a lot of posts, but if they aren't suffocating those posts, which I would have thought would be an 80 to 90 percent domination, then maybe there's just a lot of people who care about this. There are other examples, Your Honor. For example, one individual – I would direct Your Honor to the Alzheimer's post where there are – I don't know the exact number of puppy killer comments that are on that, but it is a post about providing resources to individuals who are caring for family members and loved ones with Alzheimer's, which has nothing to do with animal testing at all. And those resources that NIH is sharing and providing a space for people to talk about those resources in their own experience are being drowned out by a substantial portion of comments that aren't about the post at all. No, please. I'm just not sure what drowned out means in comment threads on the Internet. So when else can someone comment? They can skip past things and scroll quickly. It doesn't stop anybody else from commenting.  Well, so there are other examples, Your Honor. The stipulation notes that individuals have complained because they've missed NIH – sorry, they have missed attempts, tweets from NIH about resources because there were – Yeah, the other Twitter here. And the comment threads do not obscure or affect in any way access to the NIH posts, the substantive posts themselves. The comments – I don't know if NIH joins in in the comment threads. I may have seen one where maybe it looks like somebody did, but generally the comment threads are just people talking to other people. So I'm not quite sure how the comment threads are going to interfere with access to NIH's speech information. It is interfering with the ability of commenters to discuss the topic of the post with each other, to ask NIH questions about the post. Do you think these threads are somehow different than threads elsewhere on the Internet that believe almost any subject matter anywhere, there's going to be people there spewing in garbage? So I think it might be helpful, Your Honor, accepting the premise that this is a limited forum, I think it might be helpful to take us out of the Internet world where moderation is understandably difficult. If, for example, someone were hosting a town hall – No, I don't think it's helpful to go there. I mean, I know you want to, but this is – if you want to say town hall, it's like the government gets there, makes its presentation, and then says, okay, we'll be over here if you have questions, but otherwise the rest of you all talk. That's what the comment thread is. The rest of you all talk. We'll be over here if you have questions, but the rest of you can talk about whatever you want. Well, the rest of you all talk within the confines of our comment guidelines, which specifically say the comments have to be on topic, among other restrictions. You talk about this as a volume problem, which is not the same thing as a topic problem. Volume and topic are very different, and that's what I keep hearing is they're flooding it so people can't get other information. So maybe you think it's not relevant to Alzheimer's, but if they see Alzheimer's and they go, I know how the NIH does Alzheimer's research, and so I want to let people know. Don't be thinking the government's nicey-nicey here when it says here's some advice to you as you deal with Alzheimer's for someone in your family. We want you to know what this government is doing when it's dealing with Alzheimer's. Now, people have different views on that. Your Honor, I think it should be unobjectionable that if NIH were to say, we want to provide a space for individuals to talk about our public health research. We do not want this space to dissolve into a discussion of the ethics of animal testing, and so that topic is off limits. That would be appropriate. You think they can categorically make animal testing banned anywhere on the NIH website? In a limited public forum. Even when it's on topic, if you post about animal testing. That would be a content-based restriction, and I think there's a... No, no, no. This is the exact same website, and let's say once every six months, there's a post on there that talks about experiments that were done on animals or new rules about improving conditions for animals in NIH testing facilities. But I got this key word. And I think it was... Talk in here. So, if there were a policy that clearly prohibited discussion of the ethics of animal testing, if NIH were to say, for example, there has been a documented problem of all of our attempts to discuss public health and efforts to address human health, that devolving into discussion about animal testing, and that's not what we're hosting this page for. There are other places for people to talk to NIH and others about the ethics of animal testing, and that is not what this page is for. That would be a content-based restriction, and this court would address whether that was reasonable or not. What's happened here is not that different. The vast majority of NIH posts do not discuss animal testing in any way. There might be a few examples the plaintiffs have pointed to that reference animal testing, but overall, they are posts about human health. What's the fact-finding that the vast majority of your posts do not implicate animal testing? So, the relevant fact-finding here is that the district court found that no one disputed that the overwhelming lion's majority share of off-topic comments on NIH's page are off-topic comments about animal testing. I'm taking the very question that I just asked about whether animal testing is off-topic. Because it's one thing to say they're only on-topic if what the NIH post itself is is animal testing, but if in fact it is newly discovered treatment for X, and background information lets people know that the way that was discovered was through animal testing, and someone wants people to know, don't get excited about this, understand the price that was paid for this development, if that was the speech they wanted to do, that doesn't feel off-topic to me, but it sounds like you're putting that in the off-topic category. Your Honor, looking at the exhibits that we have before us, those exhibits aren't reflective of that sort of commentary. The majority of the exhibits make no attempt to be on-topic. They're one-word, sometimes two-word posts on things that are, for example, caregiving resources for people with Alzheimer's. Counselor, I don't think the question is about the comments. It's about NIH's posts. And what PETA says is that over a third of the exhibits on their face seem to be, at least arguably, the kind of posts where a comment about animal testing would be on-topic. So I see four, possibly five, examples that plaintiffs have cited in the exhibits. Notably, I think there was only one, maybe two, comments that they've actually identified that were on any of those posts. Their complaint says that they were frustrated by their ability to post on Public Service Recognition Week and Diversity in Science. I mean, they've admitted that they want to use posts that no one has argued have anything to do with animal testing as a place for them to advocate for animal testing. Have you shown the flooding? I'm still trying to understand that. To say what they haven't shown. But you have a list of words here that's at least eyebrow-raising. And your argument is you're equating flooding, the comments, with being off-topic without any factual evidence of flooding. At least what you've given me, I would be just wrong. I would not consider dozens on Internet comment threads can go on forever to be flooding. I wouldn't consider one out of five flooding, given that people have abilities to search through these things. So, Your Honor, to be clear, the other off-topic posts that don't have to do with animal testing also violate the guidelines. The problem is that there is nothing else that exists in this universe that repeats the same sorts of words that would make them suitable for filtering. So flooding has to be understood in that sense. The reason why NIH has picked the word that has is because these comments share a common theme. They share the common words. And when I say flooding, I mean it's a group of comments. It's a concerted effort that we can target through filtering. The word test. Categorically off-topic for NIH. That's not a keyword. It has never been our position. The word test is categorically off-topic. You're blocking any post that has that word. It has been our position that the word test was frequently, recurrently used in comments that were off-topic. And that is... More recently than say COVID test? In fact, that would probably be limited. I'm sorry. A comment that said COVID test would also be filtered. Yes, Your Honor. I don't know what I'm asking you, but you're doing the inundation argument here as a record evidence that test is used so overwhelmingly more by those who support or those who oppose animal testing than those who in 2020, 2021 wanted to ask about COVID test. So the stipulation doesn't say when the filters were first adopted. It does say... And it's showing really the test. What is the evidence that test is overwhelmingly used in an off-topic rather than on-topic postings for NIH? So the exhibits are what the exhibits are. And I recognize that I keep... The exhibits are what they are. I'm going through your keyword list here. Right. And I'm asking is there any factual... What is the factual basis for a facility like NIH to say we can't let anybody post a comment that has the word test in it? The rationale is the same as it is for all of the other filters. In NIH's experience, all of the terms in the filtered lists, including the ones that plaintiff does not challenge, were terms that were recurrently used in off-topic commentary. And when we're talking about a limited public forum... What recurrent meant? Is there any concrete... We don't have numbers. No, it's not in the stipulation. If the government's theory here is not really off-topic but suffocating volume, isn't that a fact question that just has to be established? So, again... Or do you think we should decide it without having that information? I find the question of what the facts are to be a bit frustrating because of the way plaintiffs have chosen to litigate this case. The joint stipulation says on paragraph 46 that the parties will not unreasonably object if the government or the plaintiffs want to add additional exhibits in summary judgment based on what's on NIH's pages. Our summary judgment briefing said that the reason we picked them is because animal testing comments constituted a lion's share of the off-topic commentary, that they were uniquely suited for filtering because they shared these common terms in NIH's experience. And that was not a point... That factual premise was not something plaintiffs meaningfully disputed, so we didn't enter additional exhibits for that point. The way plaintiffs have instead chosen to litigate this is assume that factual premise, assume that they're the lion's share, and nevertheless, you should infer viewpoint discrimination based on those specific terms or... Is one-fifth the lion's share? Of a single category of off-topic comments? I mean, for 25%... What do you mean by a single category of off-topic comments? You said there was a thread in which about a fifth of them... I think it was the off numbers when you referenced... There is not another category of off-topic commentary that comes anywhere close to that. There's not anything where there's common terms used discussing a different topic. There just isn't because there isn't a concerted effort to flood the pages with commentary. I'm kind of surprised, honestly, maybe I just shouldn't speculate like this, that certainly through the COVID era that anti-vaccine posts were not pervasive. So, there are certainly exhibits in the joint stipulation where there are commenters who say things that reflect a certain viewpoint on vaccinations. They're usually on posts about vaccinations or about antiviral treatment for COVID-19. And they're not single-word comments that are multiple people are posting the same thing. Dr. Fauci gives speech at X place. And the speech is a commencement speech encouraging people to go into public health. During the pandemic, people wouldn't have covered that with a lot of anti-Fauci, anti-vaccine comments. I'm not going to take an empirical position on that one way or the other, Your Honor. I think what we have here is... At some level, NIH's position here is this is a unique problem for NIH. Because if, in fact, you had problems with anti-vaccine stuff showing up anytime Dr. Fauci was mentioned, COVID was mentioned, even if not talking about vaccines, and yet nothing was done, that would be a problem as well. And I understand some of the stipulated record here, but I don't think it's enough in summary judgment for a summary judgment brief by lawyers to say, there's a lion's share here that is overwhelming the comment spread, which are simply characterizations without any factual documentation. So, two points, Your Honor. The first is our policy against off-topic commentary is not a policy that off-topic commentary is permissible unless it overwhelms. It is a policy that we don't want off-topic commentary because of the threat of overwhelming. The reason that we have addressed these comments is because there are multiple users posting substantially the same thing, sharing the same words, and those words are the ones that we're filtering for. And there's no evidence that that was true with respect to anything else. Even the exhibits that are critical of vaccinations, they don't have that same, you know, here are multiple people posting substantially the same comment over and over and over again on a particular thread. And without that, you know, there isn't a great basis for us to pick a filter to address that kind of off-topic commentary. But with respect to the comments that led to the filters that were chosen, there is this commonality between multiple users posting substantially the same thing over and over and over again, which makes it uniquely suited to keyword filtering. Counsel, can I ask you a question? It seems like if we agree with you on a lot of the issues in this case, so it's not viewpoint discrimination, we agree with you on forum. The last question becomes, is this policy reasonable? And the policy being, we're going to ban off-topic posts. And one of the requirements for that is just that it be workable, subject to, you know, consistent application, which I think in a practical way just means where most people understand what it means. And so I just want to understand, obviously, there are the, you say, few posts that are directly about animal testing. There's also a bucket of posts which are about the research of scientists who are known to conduct a lot of animal testing. And I guess I'd like to understand, would a comment, and there are several examples of this, saying stop animal testing. This guy does a lot of animal testing. Is that off-topic? So I understand that plaintiffs disagree with us about what the topic of NIH's posts are. I think it's reasonable to assume that an agency that posts about public health whose purpose is public health and sharing information about public health is hosting the forum for the topic of the discussion of public health. So I think that's a completely reasonable position, but sort of as you said, the other side is reasonable, too. And it seems to me the problem in terms of the case law is that your guidelines don't explain. If your guidelines explain what you think off-topic means, that might do something to remedy this problem. But right now it just says the word off-topic. It's very difficult to know whether on this kind of post or a whole host of others whether something is actually off-topic if I'm someone who wants to post. Your Honor, I would note that the term off-topic is pretty regularly used in social media policies. It would be extraordinary to suggest that that's not the sort of thing that's capable of reasoned application. I appreciate the point that on the margins there can be some debate about whether something is on-topic or not. But at bottom, I think as long as NIH is not acting arbitrarily and deciding that its posts are about public health, then that's the sort of thing that would withstand First Amendment scrutiny under the limited public forum test. I'm trying to up-the-mission technology how this works. So you say we're looking at comment threads post by post. When NIH posts, I guess their tech person posts an article, is any judgment made at that time to turn on or off different keywords? Or is this list that we have in the record, J76, a static list? Put aside the changes that were made post-litigation. I am not sure what is technologically possible. I have theories, but they're not in the stipulation, so I'm afraid of speculating. Tell me what NIH does. Do they make any effort to check and see are there other words that get added for certain posts or some turned off? For example, if we're talking about COVID tests, to return off blocking the word test in common. The filters apply across all posts. I don't believe there's a technologically possible way to turn them off for just one post. And I would emphasize, Your Honor, that we recognize that that has imperfect results. The problem that NIH was addressing is that these words were recurrently used. We would have to agree that categorically these words are so often off-topic that it's permissible for NIH to do it. Because you're not adjusting topic by topic on your posts. The question under reasonability is whether it's reasonably. It doesn't have to be the most reasonable interpretation or, sorry, limitation. It just has to be a reasonable limitation. And if there is, you know. Who came up with this list? The social media administrators at NIH. Do we know how they came up with it? Based on their experience reviewing the kinds of comments that were on NIH's posts. Is there guidance given to them on how much is too much? When, how often, even if it shows up a lot, it's also going to be relevant across the board for NIH policies? They just said which words are showing up the most and not what topics. Do they then compare to what topics does NIH discuss? So these were the words that showed up the most in commentary that was clearly off-topic. There was not even an attempt by the commenters to be off-topic. How did they decide it was clearly off-topic is what I keep coming back to. Because I really am struggling with how test is just clearly off-topic for NIH. I would, the comments that were being posted were using these terms. And the comments themselves were not related to the topic of the post. It's not a question of whether test itself is on or off-topic. It's that the comments that they saw that were off-topic were recurrently using these terms. And that's why... If the keywords can be acutely on-topic, that doesn't matter for your First Amendment analysis. As long as some people out there are using, or a lot of people out there are using them in a bad way. There's a problem that NIH is trying to address, which is off-topic comments that are using these words. And the effect of prohibiting these words might be to also filter out comments that are on-topic. But under the First Amendment, we don't require tailoring if it's a limited public forum. And the fact that occasionally this is going to be over-inclusive is not something that is required. As long as the government was reasonably attempting to address a legitimate problem. And here there was a legitimate problem of comments that were recurrently using these terms. Thank you very much. Thank you, Your Honors. Ms. Krantz, we'll give you three minutes for rebuttal. I think we've gone over our ten-minute time limit here. Thank you, Your Honors. I just want to take a moment to be clear about the burden and the factual record in this case. The burden always rests with the government to prove the constitutionality of its conduct. So to the extent the factual record is sparse, I think that's a problem for the government. It's especially a problem for the government because it's only under the government's theories that the question of when and how these keywords were developed and exactly how much off-topic speech there might be on the comment threads becomes relevant. If you didn't ask for that information, you were happy to proceed on a stipulated record and not dispute their claims of overwhelming off-topic comments. That's where we're struggling. You all agreed to do this. This isn't, you know, a contested summary judgment record. That's right. And I think... Your agreement to come forward on this record and say, fine, we'll take this given that these are overwhelming majority of comments. Well, I think my answer to you, Judge, is yes and no. Yes, it is a stipulated record, but no, the plaintiffs have never conceded that comments about animal testing are the most prevalent form of off-topic speech on the threads. I think if you read the brief at the district court level, you will see that very clear. Even the district court's own opinion makes very clear that we argue that there are numerous amounts... Sorry, that there are copious amounts of on-topic speech about animal testing and that there's nothing unique about criticism of animal testing that could justify the government's single-minded focus on animal testing as an off-topic subject matter. I also want to be clear that the district court didn't make any factual findings to say that criticism of animal testing or even comments about animal testing are the most prevalent form of off-topic speech. I think the district court said there were large amounts of off-topic speech and that might justify the decision here, but I don't think that's enough. And in fact, at summary judgment before the district court, we explained that if the NIH's benign motive is relevant, then you would have to look into questions about what decisions the NIH made, what information it was relying on. But to take a step back, I don't think those facts are actually needed to determine what course this case should take next. That's because the NIH's scheme here is by design so over-inclusive that it allows the government to talk about animal testing while silencing its critics on that very subject. And when it does that, it targets criticism in the very words it chooses to include in keyword blocking. On this theory, the NIH could decide to ban all mention of Biden or Trump in the run-up to the election, saying that they have nothing to do with the very specific posts. Even mention of Dr. Fauci, who was an important figure in leading the public health effort around COVID-19. And I don't think the problem stopped with the NIH, right? Because you could have a school board that wants to ban mention of phrases like CRT or Black Lives Matter. You could have the State Department banning criticism of its policy on Israel and Gaza, even as it is providing updates on its own conduct with respect to that speech, with respect to that action. That's what makes the keyword blocking here so dangerous, and that's exactly why we'd ask this court to reverse the discourse. Do you have any knowledge, and I guess it may just not be on the record, of how facile these keyword blocking techniques are? Can they be done post by post as opposed to categorically across pages? How easily can they be turned on and off? Right now, I don't believe they can be done post by post. The joint stipulation makes clear that these apply to the page in its entirety, not to a specific post. I don't have the specific site in the joint stipulation, but I believe all you have to do is log on to your settings and add or subtract the words that you want blocked. So it would be simple for the NIH to kind of update that list. And the fact that the NIH has shown no interest in doing that, that it continues to block these terms indefinitely, I think it's further evidence that it is not enforcing an off-topic rule, certainly not in any even-minded way, but is instead targeting criticism of animal testing and doing so because it's criticism of the agency. I really think those are the stakes of this case. There are other tools the NIH could have used if it wanted to go about targeting off-topic speech, repetitive speech, bot speech. But what it's done instead is target a particular form of criticism against the agency, and that violates the First Amendment. There were a certain group that kept using bot speech and kept repeating the same flat Earth, flat Earth, flat Earth. They then banned flat Earth. I think then what they could do is use content-neutral means to moderate that speech, so it could ban bot speech for all speakers. That's what I'm asking is how do you – okay, so they have a policy that there's no bot speech, but how do they enforce that? Well, Your Honor, I think it's telling that they haven't even – I'm asking you how do you do – I mean, it doesn't help me for you to give me an example that actually doesn't work in the real world other than to sort of shake your fingers and say no bot speech. Well, I do think it would have an effect in two respects. The first is that having that rule could deter some of the conduct. The fact that the NIH hasn't tried to – Not going to deter robots. Well, it might deter the people that are creating the bots that are being sent to – I'm not dubious about that. The NIH could also use manual review, and we don't know – Because the world is manual review. I mean, they already have the repetitive post and the guidelines. So they can do that, and then they can have – It sounds to me, again, like your position at the end of the day is manual review or nothing. I don't think it's or nothing. I think at the end of the day, our position is that keyword blocking cannot be used. What's the other alternative? Well, for example, if the bots had a similar username, I suppose at that point you might be able to use a keyword filter to target those bots. It might also be that manual review is much more efficient when you're looking at bot speech rather than looking at the content of a particular post to enforce an off-topic rule. So I don't think the NIH's hands are tied. It might be that moderation is not a completely cost-free benefit to the NIH's comment threads. This court has always said that you cannot sacrifice speech just at the altar of efficiency. So there may be – Yeah, but the consequence is if you push government into a position where it just has to have no comments, turn off the comment option on all of its posts. It's hard to see how that's a pro-speech outcome, but if that's the corner they're backed into because they don't have resources, it's unworkable to have every government agency employing armies and armies of people to manually review. And by the way, they must have these perfect First Amendment, not too discretionary standards for every review. If that's just not tenable, then they're just going to have to turn off comment threads. You're going to be worse off. I understand the concern about perfect enforcement and negative results that might lead from that. It's possible that the NIH chooses to actually limit its forum by enforcing its rules in a way that does suppress more speech. It's possible that it turns off – That's suppressing speech if it decides not to have comments. Right, it's possible – That's not suppressing speech. That's their choice. That's right, and it could be their choice to close the comment threads, and I do think that would be a bad outcome for speech. But what I think would be a worse outcome is to allow a government agency to hold open a comment thread that looks to everyone else like it's open for discussion, but behind the scenes they're using kind of the invisible hand of the government to pluck out criticism and to tilt and distort the field of public debate in these digital public spaces. I think that is the worst case scenario for free speech, and I think the First Amendment prohibits it. Thank you very much. Thank you. The case is submitted.
judges: Henderson, Millett, Garcia